FIRST NAT. BANK OF MOODY et al. v. CRESPI & CO. (No. 6105.)

(Court of Civil Appeals of Texas. Austin. Nov. 29, 1919. Rehearing Denied Jan. 21, 1920.)

1. APPEAL AND ERROR ⬤≈719(1) — "FUNDA-MENTAL ERROR" DEFINED.

In determining the scope of review, a "fundamental error" is one which does not require an examination and weighing of the evidence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fundamental Error.]

2. APPEAL AND ERROR ⬤≈719(1)—DEFENSE OF ULTRA VIRES WHICH COULD BE DECIDED FROM PLEADINGS AND JUDGMENT REVIEWABLE AS FUNDAMENTAL ERROR.

Where the pleadings did not raise an issue as to the facts but only regarding the proper construction of a contract which was fully set out and as to whether certain pleaded facts avoided defendant bank's defense that its guaranty was void because ultra vires, held, that the decision upon such issues may be reviewed under the doctrine of fundamental error without assignments of error.

3. DAMAGES ⬤≈85—MEASURE OF DAMAGES FOR PARTIAL FAILURE TO DELIVER AS DIFFERENCE BETWEEN MARKET AND CONTRACT PRICES NOT AFFECTED BY PROVISION FOR LIQUIDATED DAMAGES FOR SHORT-WEIGHT BALES.

Under a contract to sell 125 bales of cotton in accordance with cotton association rules requiring bales to average not less than 500 pounds and providing certain deductions if individual bales weighed less, the deduction provision does not obviate the seller's liability to pay the difference between the contract and market prices for the total shortage in the cotton delivered, since the object of the deduction provisions was merely to require individual bales to be of a certain size.

4. APPEAL AND ERROR ⬤≈931(3)—FACTS NECESSARY TO SUPPORT JUDGMENT PRESUMED TO HAVE BEEN FOUND.

It will be presumed on appeal that the trial court found all facts necessary to support a judgment within the scope of the pleadings.

5. BANKS AND BANKING ⬤≈260(4)—NATIONAL BANK CANNOT GUARANTEE CONTRACT FOR SOLE BENEFIT OF ANOTHER.

A national bank has no power to guarantee the performance of a contract made for the sole benefit of another.

6. BANKS AND BANKING ⬤≈280—ULTRA VIRES CHARACTER OF GUARANTY BY NATIONAL BANK NOT AVOIDED BY ALLEGATIONS OF PLEADING.

Allegations that a national bank guaranteed a seller's compliance with a cotton sales con-

tract, that it had been the bank's custom to extend credit to the seller, that the bank received exchange fees from moneys paid the seller and applied proceeds of sale on seller's indebtedness to it, etc., *held* not to show that bank had such a sufficiently direct interest in the transaction as would avoid the defense that its guaranty was ultra vires.

Error from District Court, McLennan County; H. M. Richey, Judge.

Suit by Crespi & Co. against J. B. Snell, doing business as the Snell Hardware Company, and First National Bank of Moody. Judgment for plaintiff, and defendants bring error. Affirmed in part, and in part reversed and remanded.

Allen Beadel, of Moody, and Allan D. Sanford, of Waco, for plaintiffs in error.

J. D. Williamson, of Waco, for defendant in error.

BRADY, J. Crespi & Co. filed this suit against J. B. Snell, doing business as Snell Hardware Company, and the First National Bank of Moody, Tex., to recover damage for breach of a contract between Crespi & Co. and Snell, whereby Snell agreed to sell and deliver to Crespi & Co. 125 bales of cotton, f. o. b. compress at Temple, Tex., on or before the 30th day of October, 1916. The contract was in writing, and a copy of same was attached as an exhibit to the answer of plaintiffs in error. The First National Bank of Moody was sued as guarantor of the contract upon this indorsement: "We guarantee the fulfillment of this contract. [Signed] First National Bank, J. W. Donaldson, Ca."

The pleadings show that the contract was made in accordance with the rules of the Texas Cotton Association, so far as applicable; there being indorsed on the back of the contract extracts from such rules.

Defendant in error alleged that Snell breached the contract in failing and refusing to deliver the amount of cotton stipulated, there being a shortage of 10,842 pounds, and sought to recover the difference in market value of the cotton undelivered, and also the amount of certain overdrafts paid to Snell, and certain stipulated amounts by reason of the under weight of a number of bales of cotton delivered. The plaintiff in error Snell specially answered that he had delivered to defendants in error the 125 bales of cotton stipulated in the contract, admitted the overdrafts sued for, and admitted that some of the bales were under weight, but alleged that the amount stipulated in the contract for under-weight bales was liquidated damages, and the only damages recoverable under the contract.

Plaintiff in error First National Bank of Moody pleaded that it was a national bank-

ing association, denying the guaranty, but pleaded that, if such guaranty was made, it was without authority of the bank, was wholly without consideration, no benefits accruing to the bank. by reason of it, and specially pleaded the defense of ultra vires. The bank also adopted the special answer of Snell.

To the defense of ultra vires, defendant in error specially pleaded that the bank was benefited by the execution of the contract, through the receipt of exchange on drafts drawn by Snell on 'Crespi & Co., and interest on money loaned to Snell in the purchase of the cotton; and that defendant in error relied upon the bank's guaranty and paid for the cotton in reliance thereon.

There was no jury below, and the parties made the following agreement of record:

"It was agreed that plaintiff is entitled to recover the amount sued for, unless the defenses presented prevented a recovery."

The court rendered judgment. in favor of Crespi & Co. against Snell and the bank for $1,023.43, with judgment over in favor of the bank against Snell.

## Opinion.

[1, 2] There are no assignments of error in the transcript. and the grounds stated in the formal motion for new trial are too general to constitute valid assignments of error. Plaintiffs in error, however, present two assignments in their brief, which we are asked to consider as showing fundamental error. Defendant in' error has vigorously objected to the consideration of these assignments, claiming that they do not present fundamental error, in that, in order to pass upon them, it would be necessary for this court to examine the entire statement of facts. If this were true, the rule established by. decisions of the Supreme Court would deny us the right to consider such assignments, because it is decided that the term' "fundamental error" is one which does not require an examination and weighing of the evidence to determine whether or not the assignment is well taken. But we entertain·the view that, in order to pass upon the merits of these assignments, it is not necessary in either instance to go to the statement of facts. It is conceded by counsel for defendant that, if the questions can be determined by the pleadings in the case and the judgment, a claim of fundamental error would be presented. There seems to be no dispute in the pleadings as to the facts, but only as to the question of the proper construction of the contract, which was fully set out and made a part of the defendant's answer, and the conflicting theories of recovery are clearly made issues by the respective pleadings. As to the guaranty of the bank, the facts relied upon to avoid the defense of ultra vires are especially pleaded in defendant in error's supplemental petition. Therefore we think the assignments should be considered upon their merits.

[3] The first assignment of error is to the effect that the judgment of the court is fundamentally erroneous, because the record shows that this cause is based on a written contract for the sale and delivery of 125 bales of cotton averaging 500 pounds in weight per bale,. and that the contract provides for the measure of damages for all bales delivered averaging less than 500 pounds; and therefore the amount stipulated in the contract is liquidated damages, and the difference in market price is not recoverable under the terms of the contract. It is claimed that judgment of the court is clearly based upon an erroneous interpretation of the contract, in permitting a recovery for the difference between the market price and the contract price, as to the quantity of cotton in pounds not delivered.

It is undisputed in the pleadings that Snell delivered 125 bales of cotton, but that they did not average 500 pounds, there being a shortage of 10,842 pounds, if the contract required the delivery of 62,500 pounds. The contract sued upon was in substance as follows: Snell sold to Crespi & Co. 125 bales of cotton at 12½ cents per pound, basis middling, f. o. b. compress weights at Temple, on or before October 30, 1916, and in accordance with the rules of the Texas Cotton Association, portions of which were printed on the back of the contract. The only parts of the rules affecting the contract, under the issues of this case, were those requiring the cotton to be "pressed or packed in what is commonly known as square bales, averaging in weight not less than 500 pounds per bale," and providing for deductions for short-weight bales in these terms:

Rule 2, clause 2. "In lists averaging less than 500 pounds per bale, the seller shall deduct as follows: For each bale weighing less than 500 pounds, and not under 400 pounds, $1.00; for each bale weighing less than 400 pounds, and not under. 350 pounds, $2.00; for each bale weighing less than 350 pounds, and not under 300 pounds, $3.00. All bales weighing less than 300 pounds shall be subject to rejection by the buyer."

Clause 3 of the same rule also entitles the buyer to a deduction of $1 for each bale received pressed in a gin box of dimensions greater than 27x54 inches, inside measurement.

It is the theory of plaintiffs in error that this contract did not require Snell to deliver 62,500 pounds of cotton on the basis of an average of 500 pounds for 125 bales, but that it only obligated him to deliver 125 bales; and that he fulfilled the contract by delivering 125 bales, although they did not average 500 pounds per bale, provided he would pay the deductions for the short bales as provided in the contract, and this he offered to do in his answer. He interprets the contract as pro-

viding the amount which he should pay for such bales as were under weight, and that such amount was liquidated damages, and the only damages for which he was liable under the contract. Under this construction, a failure to deliver the entire quantity in pounds is immaterial, as far as market price is concerned; the buyer's only remedy in such case being a recovery of the deductions provided in the contract for bales less than 500 pounds in weight.

On the other hand, it is the claim of defendant in error that the contract upon its face is that the bales of cotton shall average not less than 500 pounds in weight, and that consequently when the dealer buys 125 bales of cotton he buys not less than 62,500 pounds of cotton, and is entitled to that quantity. If the seller of the cotton, although delivering 62,500 pounds, delivers some bales of less weight than 500 pounds, then a penalty may be charged against him for such short weight bales; but that the contract nowhere states that it is fulfilled by the delivery of the number of bales, without delivering the specified quantity of cotton. This was the construction placed upon the contract by the trial court, and, if it is susceptible of that construction, we should, in deference to the court, sustain its judgment.

After a careful consideration of the terms of the contract sued upon, we are of the opinion that the trial court properly construed it. The stipulation in clause 2 of rule 2 for deductions for short bales, whether it be termed penalty or liquidated damages, was not, in our opinion, intended to affect the liability of a buyer to damages, in the amount of the difference in the market price and contract price on the amount of the cotton undelivered by the seller. It was not a penalty or liquidated damages for the failure to deliver less than the total quantity contracted for, but was a penalty for the failure to deliver bales conforming to the standard set forth in the contract, namely, 500 pounds; the penalty increasing as the bales diminished in weight. This provision seems analogous to that found in clause 3, where the buyer is given a further deduction of $1 for each bale received where pressed in a gin box greater than certain dimensions.

The framers of the rules of the Texas Cotton Association doubtless had in mind that there were sound business advantages, in the case of such contracts, to require the seller to deliver bales averaging not less than 500 pounds, and penalizing the seller for any variation from this standard. It may be that such considerations as the expense of handling a larger number of small bales to make up a given quantity, and the space taken up by a larger number of bales in transportation, and other commercial reasons, were in mind in the framing of this rule. At all events, we do not think that it was intended to measure the damages which the buyer might recover where the aggregate quantity contemplated in the contract had not been delivered, and as a substitute for the ordinary measure of damages, which is the difference between the market and contract price at the time specified for delivery. That it was not so intended, we think, may be easily illustrated. For example, let us assume that Snell had delivered 100 bales weighing 475 pounds each, and 25 bales weighing 600 pounds each. This would have made 62,500 pounds actually delivered, in 125 bales of cotton, which would have fulfilled the contract as to quantity, and there would have been no damages for the failure to deliver the quantity of cotton contracted for by the parties. Nevertheless, it is clear that the seller would not have been free from liability under the very terms of the contract, for he would have been subject to the penalty of $1 per bale for the 100 bales weighing under 500 pounds, and a judgment for $100 would have been recoverable. This we think demonstrates that the stipulation was not designed to deprive the seller of his ordinary measure of damages for failure to deliver the quantity covered by the contract. Believing that the trial court correctly construed the instrument, we conclude that there was no error in the judgment, which followed the pleadings, and the judgment will be affirmed as to the plaintiff in error J. B. Snell.

[4-6] The remaining assignment complains of the judgment against the First National Bank of Moody, it being claimed that it is fundamentally erroneous, because the record shows that the bank was liable, if at all, merely as a guarantor of the contract of Snell, it being beyond the power of a national bank to make a valid contract of guaranty, and that therefore the pretended contract was ultra vires and void.

Under this assignment the proposition is made that a national bank has no power, with or without consideration, to guarantee the performance of a contract made for the sole benefit and advantage of another; such act not being within the powers conferred upon such bank by law, nor incidental to any powers conferred. In view of the national banking laws, it is not doubted that this is a sound proposition of law, but the question is whether or not this contract was in fact made for the sole benefit and advantage of another. Not all contracts of guaranty by a national bank are void as ultra vires, and it is claimed in this case that defendant in error pleaded and proved that the bank received such direct benefits and had such an interest in the transaction as that it became liable under the guaranty, although, as an original undertaking, such guaranty might have been ultra vires. The bank has cited section 5136, Federal Statutes Annotated,

vol. 5, p. 82, as defining the powers of a national bank, and a number of federal cases sustaining the point that such a bank cannot be bound by contracts of suretyship or guaranty made for the sole benefit and advantage of others. These authorities are not regarded as conclusive, however, because in this case it is not sought to recover wholly upon an independent contract of guaranty, but upon the theory that the bank had such a direct interest in the performance of the contract, and derived such benefits therefrom as made it liable as for its own undertaking made for its benefit.

Neither are the authorities cited by defendant in error controlling in this case, namely, First National Bank of Greenville v. Greenville Cotton Oil Co., 24 Tex. Civ. App. 645, 60 S. W. 828, and Bay City Bank & Trust Co. v. Rice-Stix Dry Goods Co., 195 S. W. 344.

In the first of these cases it appears that the bank was directly interested in the furnishing by the Greenville Cotton Oil Company of the feedstuffs bought by Ingram with which to feed the cattle. It was shown that under the arrangement between Ingram and the bank he was to open an account with the bank, remove his deposit from another bank to the defendant bank, and was also to pay interest to it on the money advanced to pay Ingram's feed bills; also, that he was to execute a mortgage on his cattle to the bank to secure it in the moneys advanced for its reimbursement out of the proceeds of the cattle when sold, and that in pursuance to this arrangement the mortgage was actually executed. It was also shown that the feed was used to fatten the cattle, increasing their value, and without which they could not have been placed upon the market, and that Ingram paid the proceeds of the sale to the bank, which it applied to the extinguishment of Ingram's debt.

In the Bay City Bank Case, it appears that the bank was a creditor of Pitluk, in that it had purchased the account of Rice-Stix Dry Goods Company against Pitluk for an agreed amount, and had induced the dry goods company to deliver to Pitluk several thousand dollars worth of goods, which increased the value of the bank's security for Pitluk's indebtedness to it. It also appears that Pitluk was in a failing condition, and that the bank appropriated the results from the final sale of his entire assets, to the exclusion of the dry goods company, and never refused to pay the agreed price for the assigned account until all of Pitluk's assets had been disposed of and placed beyond the reach of the dry goods company.

To our minds, the facts of these cases distinguish them from the instant case, and they are not such authority as to impel us to hold that the defendant in error alleged sufficient facts to authorize the trial court to render judgment against the bank upon its contract of guaranty. We have seen that we are not at liberty to weigh the evidence or to consider the statement of facts, but the question must be decided upon the pleadings.

Defendant in error sought to avoid the bank's plea of ultra vires by special allegations, attempting to show that the bank had received such benefits under the contract as estopped it to plead that it was beyond its corporate capacity to make the guaranty. If the facts pleaded were sufficient for this purpose, we would have to sustain the judgment, because we are required to presume that the court found all facts necessary to the rendition of the judgment within the scope of the pleadings; but we are not at liberty to presume anything more than this, and, if the averments of the supplemental petition were not broad enough to take the case out of the rule that a national bank cannot undertake a contract of suretyship or guaranty for the sole benefit of another, the judgment was not authorized, and was fundamentally erroneous.

We have carefully read all the allegations of the supplemental petition, and in substance they are: That, at the time of the execution of the guaranty, defendant in error had declined to enter into the contract with Snell, without the same being guaranteed (but it is not alleged that it would not have made the contract without its being guaranteed by the defendant bank). It is averred that at such time Snell was a customer of the First National Bank of Moody, and carried his account with that bank, which had for years had an arrangement with Snell to extend him a line of credit or loans in the purchase of cotton; that on money so advanced it received interest from Snell; that Snell was buying cotton in small lots, and, when he would get together an aggregate of from 25 to 100 bales, he would sell to a cotton merchant or exporter, and would draw drafts for the purchase price, and the bank received exchange of one-fourth of 1 per cent. on the draft; that at that time the bank expected to carry on the same arrangement with Snell; and that it knew its business with Snell would be furthered, and that it would be benefited in the matter of interest and exchange by virtue of the contract between Snell and defendant in error. There is then alleged the execution of the guaranty by the bank, its acceptance, and that it was acted upon; that Snell shipped the cotton in installments and drew drafts through the defendant bank against defendant in error; and the receipt by the bank of exchange aggregating about $16. The averments proceed to state that the drafts were accepted and paid by defendant in error, the

proceeds received by the bank, and Snell given credit for such amounts, and that the moneys so paid by plaintiff in error were used by the bank in payment of the indebtedness of Snell to it, and to cover the items of interest charged to his account for moneys so advanced, and that the bank was interested in the fulfillment of the contract and reaped the benefits thereof. It is then alleged that the defendant in error acted and relied upon the guaranty, and that the bank never at any time denied its liability upon the contract, but at all times held itself out to defendant in error as liable thereon.

We do not think these averments sufficient to bind the bank, especially as it is not alleged that at the time the contract was made Snell was indebted to the bank, nor that it had even agreed with Snell to advance him the money with which to purchase the cotton in question, and to charge him interest therefor, but merely described the custom and general business arrangement with Snell, and that the bank expected and intended to carry on the arrangement. As to the matter of exchange, in addition to the triviality of the amount received by the bank, as compared with the amount of damages claimed for the breach of the contract, it was not averred that the bank would not have received the benefit of the exchange had it not guaranteed Snell's contract. Neither is it alleged that, if the contract of guaranty had not been made with the bank, it would not have made the loans to Snell anyway, and that it would not have received the interest. It is not alleged that Snell was not amply solvent and able to respond in damages for breaches of his contracts, independently of the contract of guaranty by the bank, and also to make arrangements with others for the loan of money in the purchase of his cotton. In the absence of these or similar averments, we do not think it can be successfully contended that the defense of ultra vires is met in such a case.

While a national bank may undoubtedly, under some circumstances bind itself by contracts of suretyship and guaranty, they must be shown to be directly and immediately for its benefit. Sound public policy demands that such undertakings should be closely scrutinized when undertaken by a bank, and that its officers and agents should not be permitted to bind it to speculative contracts in which it has no direct or immediate interest, or to contracts generally for the accommodation of its customers.

The pleadings of defendant in error, even as against a general demurrer, seem to us to be too vague and indefinite to bind the bank upon a legal guaranty of this contract, and to avoid its defense of ultra vires. However, the issue was sought to be made by the pleadings, and it may be that upon another trial defendant in error can and will plead and prove facts which would show liability upon the part of the bank.

As to the plaintiff in error, J. B. Snell, the judgment will be affirmed; but, as to the plaintiff in error First National Bank of Moody, the case will be reversed and remanded for another trial in accordance with this opinion.

Affirmed in part, and in part reversed and remanded.